## ST. LOUIS-S. F. R. CO. v. CHOCTAW COUNTY EXCISE BOARD.

No. 25636.  June 25, 1935.

Rehearing Denied Sept. 10, 1935.

J. W. Jamison and Cruce, Franklin & Satterfield, for plaintiff in error.

O. A. Brewer, Co. Atty., and Ralph K. Jenner, Asst. Co. Atty., for defendant in error.

**WELCH, J.** The first question involves the general fund of Choctaw county. Protestant contends that there was a surplus balance to the credit of the general fund of $541.98, which the taxing officials were required to use, but failed to use, as an item of financing the appropriations. The taxing officials claim there was no surplus balance to the credit of such fund, but on the contrary that there was a deficit in the sum of $1,026.68. No surplus balance was used or considered by the excise board in calculating the rate of levy, nor did they estimate any receipts from back taxes.

A surplus balance, as used for the purposes herein considered, consists only of cash actually on hand in excess of all obligations for which it was originally pledged. Gallion v. Excise Board of Oklahoma County, 171 Okla. 76, 42 P. (2d) 508; In re Monsell, 142 Okla. 130, 285 P. 836.

The record here shows that on June 30, 1933, the county treasurer had cash on hand belonging to the 1932-33 general fund in the sum of $18,430.09. There were outstanding obligations, including unpaid warrants and contracts pending, which were 1932-33 obligations, in the sum of $32,944.45, exclusive of interest on warrants. From this it may be seen that there was no surplus balance.

Although the protestant contends that there was a surplus balance, which we have shown does not exist, we observe that the gist of the contention is in truth a contention that there was an item of taxes in process of collection, that is, net, uncollected and unencumbered taxes of the closing fiscal year, in the sum of $541.98, which the protestant says the taxing officials were required to use in making the appropriations and the levies. We held in Sinclair-Prairie Pipe Line Co. et al. v. Excise Board of Seminole County, 171 Okla. 382, 42 P. (2d) 501, that such net, uncollected and unencumbered taxes must be used for such purpose by reason of the provisions of chapter 85, S. L. 1933, subject, however, to the same restrictions as apply to any other item of revenue from sources other than ad valorem taxation. Berryman et al. v. Bonaparte, 155 Okla. 165, 11 P. (2d) 164; Protest of St. Louis-San Francisco Ry. Co., 166 Okla. 147, 26 P. (2d) 744; Sinclair-Prairie Pipe Line Co. et al. v. Excise Board of Seminole County, supra.

The protestant refers to this item or amount of taxes in process of collection as being an item to be taken into consideration in calculating the surplus balance on hand, or in determining whether there is any surplus on hand. A true surplus balance on hand is usable to finance the appropriations for the new fiscal year. This was true under section 12678, O. S. 1931, and remains true under the amending provisions of chapter 85, S. L. 1933. However, a reference to the item of prior net, unencumbered taxes unpaid, or in process of collection, as being a surplus balance on hand for such purpose is an inaccuracy of expression. An anticipation of future collection of back taxes is not, strictly speaking, a present, existing surplus balance in the sense that surplus cash on hand is a surplus balance. It may be that the portion of the prior years tax levy constituting net, uncollected and unencumbered taxes might be referred to as a surplus balance for some purposes, but such reference in cases of this nature usually results only in confusion. While this item of the financial statement, subject to proper restrictions, is usable in making the appropriations and levies, we cannot change the inherent character of the item by whatever name we call it. In reference to the item of net, uncollected and unencumbered taxes or considering its use as an item of financing appropriations for a year subsequent to its levy, it can be nothing but anticipated income.

It is anticipated income from sources other than ad valorem taxation, as the term is employed in section 12678, supra, because it is not anticipated to be received from ad valorem taxes levied for the year in which the new appropriations are being made. It is the financing of the new year's appropriations with which we are concerned, when we consider the amount of this term of taxes in process of collection.

We now consider whether or not there were net, uncollected and unencumbered taxes in the sum of $541.98, as contended by protestant.

The record shows that on July 1, 1933, the net taxes in process of collection for the preceding fiscal year was $15,464.34, the calculation being properly made under the rule announced in Branch v. Excise Board of Oklahoma County, 171 Okla. 585, 43 P. (2d) 90. For that year there were outstanding unpaid warrants in the sum of $28,409.22, and valid claims and contracts in the sum of $4,535.23, or total of both $32,944.45. There

was cash on hand for that year of $18,430.09, or an excess of outstanding warrants and claims over cash on hand of $14,514.36. To this last figure the taxing officials added $1,976.66 for interest on outstanding warrants, making the total of $16,491.02, as the aggregate encumbrance upon the taxes in process of collection for the preceding fiscal year, thus arriving at the conclusion that there were no net and unencumbered taxes in process of collection to be taken into consideration.

Protestants disputes these figures only in two instances, contending that only $905.63 should have been reserved for interest on warrants, and that the figure of cash on hand should have been increased $388.53, thus arriving at the conclusion that there was the sum of $422.90 of net, uncollected and unencumbered taxes to be taken into consideration as taxes in process of collection in financing the budget for the new fiscal year.

In the preceding fiscal year there was a net appropriation for interest on warrants of $1,450. The amount actually paid out on such interest to June 30, 1933, was $544.37. The difference between these two items, or $905.63, is claimed by protestant as the limit which could be calculated for interest accrued or accruing on unpaid warrants.

We have in several cases heretofore considered the question of the correct amount of reserve for interest. In the case of C. D. Coggeshall & Co. v. Smiley. 142 Okla. 8, 285 P. 48, we said in syllabus 15:

"The excise board is authorized to deduct from the balance on hand at the end of the fiscal year an amount sufficient to liquidate all valid unsettled contracts made during that fiscal year."

In the case of Protest of Chicago, R. I. & P. Ry. Co., 164 Okla. 72, 22 P. (2d) 1002, this court, in discussing interest on warrants and the amount of assets to be retained or reserved for its payment, said:

"The financial statement showed the amount of the outstanding warrants for that fiscal year. Under the provisions of the statute, those warrants draw interest at the rate of 6 per cent., and the amount of that interest constitutes a part of the valid unsettled contracts made during that fiscal year. In order that there may be no question in the future, we repeat that in determining the amount of valid unsettled contracts made during a fiscal year at the end of the fiscal year, the amount of interest on outstanding warrants for that fiscal year may be added to the principal amount of those warrants."

In the more recent case of Morley et al. v. State ex rel. Board of Education City of Tulsa, 171 Okla. 46, 47 P. (2d) 170, we held in syllabus 4:

"In determining the amount of valid unsettled contracts made during a fiscal year at the end of the fiscal year and the amount necessary to liquidate such contracts, the amount of interest on outstanding warrants that have accrued and will probably accrue in the future may be added to the principal amount of such warrants."

In the body of the Morley Case, supra, we find the following expressions:

"While in the last-mentioned decision it is not clear whether the item reserved for the payment of interest on outstanding warrants contemplates the payment of interest already accrued or which would accrue in the future, the uncertainty is not of controlling importance, since the future interest is as much a part of the obligation created by the warrant as is the accrued interest, and its payment is just as essential in liquidating the debt.

"Since the school board made no allowance for the payment of accruing interest, it was proper for the excise board to do so. The amount of $20,000 was not unreasonable in view of the amount of outstanding warrants, to wit, $400,000. * * *

"In order to avoid confusion, it may be stated at this point that only so much of an unexpended appropriation or interest need be preserved as will be reasonably necessary to pay the accruing interest on outstanding warrants."

And:

"The failure to make any provision for interest in 1934-1935 is a plain and glaring neglect of duty. We will not condone a course of conduct which, if pursued, will saturate the sinking fund of the school district with funding bonds and judgment indebtedness when a timely and proper effort is made to avoid such consequences."

And:

"The important thing is that provision must be made to meet this obligation imposed by law."

Although the cited cases do not involve the exact state of facts we have here, we observe that they do lay down the rule that the interest on warrants is a valid obligation, and that it is the imperative duty on the part of taxing officials to adequately provide therefor.

It is to be observed in the first two cases cited on this point that the amount to be reserved for such purposes was not restricted to the amount of an unexpended portion of an appropriation which might have been previously made therefor, nor does the amount of the previous appropriation control in the last-cited case. It is our conclusion on this point that the controlling limitation of any such reserve for this purpose should be the amount which may reasonably be said to be adequate for the purpose. There is no showing in this record that the $1,976.66 reserved for interest on warrants is excessive for the purpose, in view of the outstanding obligations exceeding $32,000.

Protestants assert that the sum of $388.53 collected during the fiscal year 1932-33 from sources other than ad valorem taxation became a part of the 1932-33 general fund cash, and was pledged toward the payment of 1932-33 obligations; that although collected and pledged for such purpose, it was illegally credited by the county treasurer to the 1931-32 general fund. The facts are in accord with this contention, and are not denied by the taxing authorities. We held in Protest of Chicago, R. I. & P. Ry. Co., 150 Okla. 167, 1 P. (2d) 383, that funds due from similar sources could not be included in a financial statement as an asset until received by the treasurer of the municipality involved. So such funds do not become an asset until collected and then only for the year in which collected. See, also, Protest of St. Louis-S. F. Ry. Co., 166 Okla. 50, 26 P. (2d) 212; Protest of Trimble, 151 Okla. 74, 300 P. 406. It may be true, as asserted by protestee, that these funds were originally anticipated to be received during the fiscal year 1931-32, and formed a part of the basis of 1931-32 appropriations, yet such anticipated income did not actually become a portion of the 1931-32 general fund, because it was not received by the treasurer of the municipality during such fiscal year. We point out that the funds were collected in the 1932-33 fiscal year and immediately became a part of the 1932-33 general fund (H. R. Gallion v. Excise Board of Oklahoma County, supra), and became pledged for 1932-33 general fund purposes, and it therefore could not be employed for the payment of 1931-32 obligations. See, also, In re Chicago, R. I. & P. Ry. Co.'s Protest, 142 Okla. 242, 286 P. 316, and Prince v. Oklahoma Natural Gas Co., 139 Okla. 185, 281 P. 795.

The taxing officials seek to apply the rule that although the funds may have been

collected for 1932-33 purposes, they had in fact been spent for other purposes, to wit, in payment of 1931-32 obligations, and that therefore the case of In re Tax Protest of St. Louis San Francisco Railway Company, 170 Okla. 123, 39 P. (2d) 99, should apply; their contention in this regard is untenable for the reason that the record disclosed that on June 30, 1933, the 1931-32 cash fund showed a balance of something over $400 with several thousands of dollars of 1931-32 warrants charged against it and other assets. Under such circumstances the money was not actually expended on June 30, 1933, and the rule announced in Protest of Downing, 164 Okla. 181, 23 P. (2d) 173, and Protest of Bledsoe, 161 Okla. 227, 17 P. (2d) 979, is applicable to the facts as presented by the record here. This item is, however, not sufficient in amount to change the result, and the judgment of the Court of Tax Review denying the protest as to the county general fund is sustained.

Questions are raised by protestant's 16th, 23rd, and 27th causes of action involving general fund levies for various common school districts within the county. It is stipulated that the evidence as to protestant's cause of action 16, involving school district No. 3, is applicable to all of such school districts. What we have already said covering the questions involved in considering the county general fund levy adequately covers all of the questions raised in connection with these school district levies.

The questions raised relate to the necessity of calculating and making use of net, uncollected and unencumbered taxes in financing the budget, the manner of calculating and using that item, and the proper application of collections received during the fiscal year 1932-33 from sources other than ad valorem taxation, to wit, income taxes.

The record here shows, as to school district No. 3, that in August, 1932, the school district treasurer received $228.80 as an apportionment of income taxes. From what we have heretofore said it will be seen that upon its receipt it became a portion of the 1932-33 general fund. We find, however, that on June 30, 1933, the school district only had $4,013.32 in cash to the credit of its 1932-33 general fund account. There were outstanding 1932-33 warrants, current claims, and contracts pending, and interest accrued and accruing thereon in the total sum of $4,710.69; the difference between these two items is $697.37. If this $228.80 were restored to the 1932-33 cash, the outstanding obligations would still be in excess of the cash, and there would therefore be no surplus balance. It is suggested in the briefs and some of the testimony that there were net, uncollected and unencumbered taxes amounting to $851.68, and this item is shown in the financial statement as $796.75. The amount of this item becomes immaterial in this instance by reason of the fact that the record, as disclosed by the financial statement introduced in evidence by the protestant, shows there was no amount of money collected by this school district during the year 1932-33 from back taxes in excess of the use for which it was originally levied. It therefore follows from what we have previously said that no portion of any net, uncollected and unencumbered taxes could be considered by the taxing authorities as an item of financing appropriations for the year 1933-34.

The judgment of the Court of Tax Review denying the protest of the general fund levies of such school districts is therefore sustained.

Protestant's 19th, 22nd, 26th, 36th, 40th, and 42nd causes of action involve the question stated by protestant as follows:

"Under chapter 13, page 32, Session Laws 1933, no levy can be authorized for transfer of pupils where the pupil is in a grade which is being taught in the transferring school."

It is admitted that the appropriations involved are for transfer fees for pupils transferred from a school district where the grades in which the pupils were receiving instructions were taught. Protestant contends that chapter 13, S. L. 1933, and particularly section 2 thereof, precludes the right of a pupil to be transferred from one school district to another where the transferring district teaches the grades in which the pupil is entitled to pursue his studies. That section provides as follows:

"Every child entitled to the provision of this act shall be authorized to attend school free of tuition in the district where he resides; provided, that when no instruction is furnished, in said district in the grade which he is entitled to pursue, a pro rata part, based upon scholastic enumeration, of public funds of said district as provided in section 1 of this act, shall be credited to the district where he attends school, according to the provisions of this act."

We note that the first section of the act guarantees the right of every child to a free

common school education, including high school. The second section authorizes the pupil to attend free of tuition in the district where he resides; it provides, further, that if no instruction is given in the district of his residence in the grade which he is entitled to pursue, his pro rata part of the funds of the district shall be credited to the district to which he is transferred. Other provisions of said chapter provide that the state shall pay any balance required of a transfer fee not exceeding a certain amount.

We do not agree with protestant's contention that these provisions exclude the right to transfer for other reasons. The entire act indicates rather that it was the legislative intent to guarantee a common school and high school education to every child, pledging therefor a certain amount of aid by the state when necessary. Section 2 provides and requires that the school officials shall make provision for a child's pro rata part of its school funds to be credited to a tranferee district if the child's grades are not taught in the district of his residence. This would indicate that the law now makes mandatory upon the part of the school officials the allowance of a transfer of the pupil in such case. Prior to the enactment of the law here considered, all questions relating to the transfer of pupils from one school district to another were discretionary with certain officials.

The fact that chapter 13, S. L. 1933, requires the transfer of pupils in certain cases does not necessarily imply that transfers for any other proper reasons or purposes are thereby excluded. We conclude that the act does not contain language to that effect. Had such been the intent of the Legislature, it could have easily so provided by apt language.

Protestant cites section 3 of the act, wherein it is provided:

"Nothing in this act shall be construed to prevent the transfer under the provisions of this act, of any child to a district in another state, if the school to which application for transfer is made is nearer, by commonly traveled road, than to any school in Oklahoma which the transferred child is eligible to attend."

And protestant points out that no such proviso is contained in section 2, and suggests that had the Legislature intended that a transfer from one school district to another within the state could be made for

other reasons than that stated in section 2, it would have included the other reasons in a proviso in section 2. We do not agree with protestant's reasoning in this regard. In our opinion the cited proviso contained in section 3 more nearly indicates that the Legislature did not intend to prohibit transfers in all other cases, or for all other reasons, except for the one reason mentioned in section 2, but that it had in mind the fact that other good reasons could and might exist for a transfer. Provision being made for a transfer even to a district without the state, where such district is more readily accessible by commonly traveled road. We cannot believe that the question of the state line was the impelling reason for the proviso. But we rather think the proviso was inserted so that a child might attend school at a place nearer his home, and that the reference to another state was only incidental to the motive.

Section 4 of chapter 13, S. L. 1933, provides for a hearing to be held by the county superintendent upon application for transfer of pupils, and for appeal therefrom to the board of county commissioners. That section contains this sentence:

"No transfer shall be discretionary with the county superintendent or county commissioners when the district from which the transfer is to be made fails to provide instruction of the proper grade, as hereinbefore set out."

That provision is very pertinent here and well-nigh controlling on the question. Hearings and appeals are provided for, upon application for transfer. It is specifically provided that in those applications where the resident district does not teach the desired instruction there shall be no discretion. Thus clearly indicating both that there are other causes for transfer, and that as to such other grounds or causes for transfer, there may be some discretion exercised by the county superintendent and reviewed on appeal by the board of county commissioners.

It therefore follows that for the reason set out in section 2 of the act above quoted, the transfer is mandatory, and that while the transfer for other purposes is not mandatory, the same may be legal, and an appropriation therefor likewise permissible and legal. Such is the appropriation here attacked by protestant.

We find no error in the judgment of the

Court of Tax Review denying the protest on these grounds, and the same is affirmed.

McNEILL, C. J., OSBORN, V. C. J., and RILEY, BUSBY, PHELPS, and CORN, JJ., concur. BAYLESS, J., absent. GIBSON, J., concurs in part and dissents in part.

GIBSON, J. (dissenting in part). Because of prior decisions of this court (Sinclair-Prairie Pipe Line Co. v. Excise Board of Seminole County, 171 Okla. 382, 42 P. (2d) 501, and Gallion v. Excise Board of Oklahoma County, 171 Okla. 76, 42 P. (2d) 508, I concur with the majority opinion in holding that net, uncollected and unencumbered ad valorem taxes levied and assessed for the year immediately preceding the current fiscal year should not be considered by the excise board in determining the amount of the surplus balance on hand at the beginning of such current fiscal year.

I cannot agree with the statement contained in the majority opinion which reads:

" * * * It (net, uncollected and unencumbered taxes in process of collection) is anticipated income from sources other than ad valorem taxation, as the term is employed in section 12678, supra (O. S. 1931), because it is not anticipated to be received from ad valorem taxes levied for the year in which the appropriations are being made."

It matters not in what year ad valorem taxes are collected, they retain their character and are distinguished from "miscellaneous income from sources other than ad valorem taxes," and to destroy that distinction can only result in confusion.

Nor can I agree with the majority opinion in its conclusion as to the amount of the reserve for interest on warrants. For the year 1932-1933 there had been appropriated $1,700 for interest on general fund warrants, of which amount $250 had been canceled, leaving a net amount of appropriation for that purpose in the sum of $1,450. Out of said net sum there had been expended up to June 30, 1933, for interest on said warrants, outstanding for said year $544.37. The difference between the net appropriation and the amount expended for interest on warrants for the fiscal year 1932-1933, or the sum of $905.63, was all that could be reserved for interest on warrants for that year. Certainly the amount of "reserve" could not exceed the unexpended balance of the appropriation for that purpose, there being no surplus balance in the general fund. To hold otherwise is to say that after the expiration of the fiscal year the excise board may convene and increase an appropriation made and approved for some prior fiscal year, for, in the instant case, that is the only way in which the unexpended balance of the appropriation could be increased to the extent that it will equal and not be exceeded by the reserve for warrant interest. The word "reserve," as employed in the budget and estimate of needs of a county or municipal subdivision, has no different meaning than when employed in ordinary usage. It is something kept back or withheld, which, of course, imports a present possession of a fund or supply which, or a part of which, is kept back.

I agree with the majority opinion in its holding that income taxes received by the county in the fiscal year 1932-1933 should be credited to the funds of that year and not the preceding fiscal year, although such taxes accrued during the preceding fiscal year. Its receipt was not anticipated in the preceding year. At the time the budget for the current year was made and the appropriations for such year were approved, the amount of the income tax to be received that year was known. It was on hand and was appropriated for the needs of the current year. The question of the application of the sales tax is not involved in this appeal, but the majority opinion holds that it is credited to the funds of the current year in which it is received by the county as is the income tax, without reference to the year in which the tax accrued. I cannot agree with that holding. At the beginning of the fiscal year an estimate is made by the excise board of the amount of sales tax that will be received by the school district, etc., during the twelve months that comprise the current fiscal year. Such estimate is not limited by nor does it bear any relation to the amount of the sales tax received during the preceding fiscal year. It depends upon and varies with the scholastic enumeration of the school district, and the amount per capita varies from year to year in keeping with such changes as there may be from the receipts from sales taxes from year to year. When the estimate to be received from sales tax has been made, the amount to be raised for the benefit of the general fund of the school district by ad valorem taxes is decreased by the amount estimated to be received from the sales tax. It is to that extent a tax in lieu of ad valorem taxes. Warrants are issued against the estimated sales tax receipts in the same manner and to the same extent as warrants are issued against the estimated ad valorem

tax receipts. I can see no reason for applying a different rule to the disposition of receipts from sales tax from that which governs receipts from ad valorem taxes. At the time the sales tax is paid over by the state to the county, such payments are earmarked as to the year and the month in which they accrued and are as easily distinguishable as to time of accrual as are ad valorem taxes.

For that reason, I am of the opinion that sales taxes which accrue in a fiscal year, although not received by the school district until the ensuing fiscal year, must be credited to the funds of the fiscal year in which such taxes accrued until the warrants against the estimated sales tax for such year have been paid. Over-collections of such taxes only should be credited to the funds of the fiscal year in which they are received by the school district.

I cannot agree with the majority opinion in its interpretation of chapter 13, S. L. 1933. In State ex rel. Board of Education of the City of Tulsa v. Morley et al., 168 Okla. 259, 34 P. (2d) 258, this court said:

"A statute should be given construction which renders every word operative rather than one which renders some words idle and nugatory. * * *

"The presumption is that the Legislature expressed its intent in a statute and that it intended what it expressed."

Section 2 of the cited statute is as follows:

"Every child entitled to the provisions of this act shall be authorized to attend school free of tuition in the district where he resides; provided that when no instruction is furnished in said district in the grade which he is entitled to pursue, the pro rata part, based upon scholastic enumeration, of public funds of said district as provided in section 1 of this act, shall be credited to the district where he attends school, according to the provisions of this act."

The majority opinion reads out of the quoted section of the act the proviso or condition that a pupil may be transferred to another district "when no instruction is furnished in said district in the grade which he is entitled to pursue," and makes it possible for a pupil to leave the district of his residence and attend school in any other district of the state at the wish or whim of the pupil, without restriction. I believe that the maxim "inclusio unius est exclusio alterius" applies here. The Legislature, by including a condition under which a pupil can transfer from one district to another, in my opinion, intended to exclude the right of that pupil to transfer for other reasons.

Section 3 of the act was evidently passed for the benefit of scholastics residing in the border counties of the state, and makes it possible for such scholastics under certain conditions to transfer to a school of a neighboring state, but, in my opinion, such scholastics can transfer only under the proviso contained in section 2 of the act, that is to say, when no instruction in the grade he is entitled to pursue is furnished in the district of which he is a resident.

Section 4 of the act contains a provision for hearing the application of a pupil for transfer. It is true that this section of the act contains the language: "No transfer shall be discretionary with the county superintendent or county commissioners" when the district from which the transfer is to be made fails to provide instruction of the proper grade, as hereinbefore set out, but, in my opinion, this merely means that at the hearing the only question to be inquired into is whether the grade which the pupil is entitled to pursue is taught in his district and in the district to which he seeks a transfer, and whether or not the district to which he seeks a transfer is willing to receive the pupil, and when such facts exist, it is mandatory upon, and not discretionary with the authorities to order the transfer.

In my opinion the construction placed upon this act by the majority opinion may lead to a disruption of the public schools in certain localities and defeat the guaranty of a free common school education to those children who do not wish to attend school in a district other than the one in which they reside.